# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 2, 2004 Session

## STATE OF TENNESSEE v. LARRIE MACLIN

### Direct Appeal from the Criminal Court for Shelby County
### No. 03-00140     Joseph B. Dailey, Judge

---

### No. W2003-03123-CCA-R3-CD  - Filed February 9, 2005

---

A Shelby County jury found the Defendant, Larrie Maclin, guilty of reckless aggravated assault and of being a felon in the possession of a handgun.  The trial court sentenced the Defendant to four years for the reckless aggravated assault conviction and two years for the felon in possession of a handgun conviction, to be served concurrently.  On appeal, the Defendant contends that: (1) the trial court erred by denying the Defendant's motion to suppress the weapon found in the Defendant's vehicle; (2) the trial court erred by failing to sever the trials for the aggravated assault offense from the felon in possession of a handgun offense; (3) the State did not fully comply with the Defendant's request for discovery; (4) the admission of an unavailable witness' statements violated the Defendant's right to confront all witnesses; (5) the trial court erred by finding that a witness' statements were excited utterances; (6) the trial court erred by admitting evidence showing that the victim had subsequently died; (7) the State violated an order of the trial court by questioning the Defendant about the victim's death; (8) the trial court erred by allowing the State to ask the Defendant if he was married at the time he was sexually involved with the victim; (9) the trial court erred by not allowing the Defendant to impeach a witness' credibility with a prior conviction involving dishonesty; and (10) the trial court gave improper jury instructions on reckless aggravated assault.  After thoroughly reviewing the record and the applicable authorities, we affirm the Defendant's conviction and sentence for the felon in possession of a handgun conviction.  We conclude that the trial court improperly instructed the jury on reckless aggravated assault.  Further, having concluded that this instructional error was not harmless beyond a reasonable doubt, we reverse the Defendant's conviction for reckless aggravated assault and remand the case for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the Appellant, Larrie Maclin.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Williams L. Gibbons, District Attorney General; and Michelle Parks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

In January 2003, the Shelby County Grand Jury indicted the Defendant for aggravated assault and for being a felon in the possession of a handgun. A Shelby County Jury convicted the Defendant of both of these charges. The trial court sentenced the Defendant to four years for the reckless aggravated assault conviction and two years for the felon in possession of a handgun conviction, to be served concurrently. The following evidence was presented at the Defendant's trial and sentencing hearing.

### A. Trial

The parties stipulated that the Arthur May Newby ("the victim") "died of causes unrelated to the [D]efendant or the facts of this case and therefore is unavailable as a witness for this trial." The parties then stipulated that at the time of the alleged handgun offense, the Defendant had been convicted of a felony in 1980.

Ronald Weddle, an officer with the Memphis Police Department, testified that, on August 28, 2002, he received a 911 hangup call from Arthur May Newby's ("the victim") address sometime in the middle of the afternoon. He said that when he arrived at the address he and his partner, Officer Gaylor, knocked on the front door. He testified that a man that he identified as the Defendant and a woman that he identified as the victim opened the door. Officer Weddle testified that, when he arrived at the location, the victim was "very upset, visibly - crying," and the Defendant was calm. He said that the victim explained that she called 911 because she got into an argument with the Defendant, her boyfriend of nine years, when he was driving her home from work. The officer testified that the victim told him that the Defendant "pulled a gun" on her, inside the car, and the Defendant told her "[i]f you don't shut up, I'm going to blow your mother-f***ing head off." He further testified that during his conversation with the victim he noticed that she had a cut on her lip, and her face was swollen.

Officer Weddle testified that the victim told him that she believed that the gun that the Defendant pulled on her was located inside the Defendant's truck. He said that the victim explained that the gun was under a blue cloth somewhere in the truck, and she told the officer that she observed the Defendant putting a cloth over the gun and bending over as though he was going to place it under the seat. He testified that, after the victim told him that the gun was under the seat, he placed the Defendant under arrest and began to work on the paperwork while his partner went to the vehicle.

Officer Weddle testified that he observed his partner walk up to the car and look in the window, and his partner made a "motion for [Officer Weddle] to come up to the vehicle." He said that, when he approached the vehicle, he looked through the window onto the seat and "[t]here was a blue cloth, and under it, sticking out from under it was what appeared to be the barrel of a handgun." He testified that he then notified his lieutenant, and his partner secured the weapon, which he believed was "a revolver . . . a thirty-eight caliber handgun, long barrel, rusted finish." Officer Weddle testified that he discovered that the gun was loaded with what he believed were "five or six live thirty-eight caliber rounds." Officer Weddle testified that his partner took the victim to the police station to give her statement to investigators.

On cross-examination, Officer Weddle testified that he did not see what happened, and he did not know what caused the victim's injuries. He said that the victim told him that the Defendant was hitting her in the face on the ride home and when they got back to her house, the victim said that all of these events occurred before the officers arrived. He testified that the victim told him that, when the Defendant pointed the gun at her in the car, she continued to argue with him. Officer Weddle testified that he did not remember if he asked the Defendant for his version of the events before or after he detained the Defendant, but he said that he put the Defendant in the police car before his partner found the gun in the Defendant's vehicle. Officer Weddle testified that he decided to arrest the Defendant to maintain the victim's safety, because of the victim's injuries, the allegations that a weapon was involved, and because the Defendant was "indifferent" when questioned about the events.

James Gaylor, an officer with the Memphis Police Department, testified that, on August 28, 2002, he and Officer Weddle were called to the victim's residence at about 4:30 p.m. as a result of a 911 hangup call. He said that he entered the house and met the Defendant and the victim. He testified that the victim had "some bruises . . . or swelling on her face," and that "[s]he was pretty shaken up." Officer Gaylor testified that the victim told him that she and the Defendant got into an argument on the way home from work, and the Defendant pulled out a gun and "pointed it at her head and stated he would kill her if she didn't shut up. And if her kids got involved, he would kill them too." He said that the victim explained to him that the Defendant used his hands to hit her in the face. Officer Gaylor testified that the victim told him that she and the Defendant drove home and went into the house, and the Defendant continued to hit her in the face. He said that the victim told him that she called 911, without the Defendant's knowledge, and then hung up the phone.

Officer Gaylor testified that after the victim described the gun to him he detained the Defendant in the police car. He said that the victim told him that the gun was located in the Defendant's vehicle, wrapped in a blue cloth, and the officer went to the Defendant's car and "observed the pistol on the seat with the blue towel wrapped around it with the barrel sticking out of it." He testified that he knew the vehicle belonged to the Defendant based on the victim's statements and because he "ran the tag that came back to him - registered to [the Defendant]."

On cross-examination, Officer Gaylor testified that he was not present when the victim received her injuries, however, he stated that they looked "pretty fresh." He said that he did not

remember exactly what he and Officer Weddle asked the Defendant on the scene, but he did recall that the Defendant was unwilling to offer any information. He testified that the Defendant was in the police car before the officer found the gun in the Defendant's car.

James Patterson, a detective with the Memphis Police Department, testified that on August 28, 2002, he was a felony response officer and was present when Officers Weddle and Gaylor brought the Defendant, the victim, and the evidence to the police station. He testified that he took statements from the Defendant and the victim, and he advised the Defendant of his rights. He testified that when he first met the victim "she was really scared," and very tense. Detective Patterson testified that the victim had "discoloration about her face and a cut on her lip . . . and . . . bruising around the cheekbones." On cross-examination, Detective Patterson testified that he believed the victim "was terrified" because of what had just happened. He said he did not believe her demeanor represented anger or nervousness about being in the police station.

The Defendant testified that the victim was "a girlfriend of his," and that, as of August 28, 2002, the victim had worked for him for about a year. He said that, on August 28, 2002, he picked the victim up, brought her to work at "the shop," and then he left to "do the house calls." He said that when he returned, no one was in the shop, and the victim showed up about two hours later. He testified that he told the victim that "we're not going to be able to use you down here because you're not dependable." The Defendant testified that the victim had a "sack" from which she took out a beer and "a dark-colored gun with a long barrel - an old rusty gun . . . ." He said that he told the victim that he "was gonna call the police and turn [the gun] in," and the victim "got real rowdy . . . she really kind of got upset then." The Defendant testified that the victim had a washing machine under warranty that he needed to fix so he got a new one, as a replacement, and then told the victim that he was going to "take [her] on to the house." He said that, on the car ride to her house, the victim was "still trying to persuade [him] . . . not to call the gun in." He testified that he "never did take the gun from her," and, when they arrived at the victim's house, he brought the washing machine in to hook it up, and he asked the victim "where is the bag?" The Defendant testified that he told her to give him the phone and, when she did, he called the police and "as soon as [he] started dialing 911, she started getting loud again . . . and [he] hung up the phone." He said that he told the victim that he would call the police again after he had installed the new washing machine.

The Defendant testified that he did not call the non-emergency police phone number because he did not have the phone number, and he "just dialed what [he] knew" because he did not want to waste time because the victim was "constantly getting upset." He testified that, while he was installing the washing machine, he asked the victim to get his water bottle out of his car and refill it, and he heard her go outside, and she brought him his water bottle, refilled. The Defendant testified that, while he completed the installation, he heard the victim talking in the front of the house, and he went to the front room and saw her talking to the police. He said that the police told him to "put [his] hands behind [his] back . . . [a]nd they took [him] on out the door." He said that he told the officers that he was the person who called the police and then he decided that, once the handcuffs were on, "there wasn't [any] point in talking to [the officer]." He testified that the police

never asked for his side of the story before they put him in the police car. He said that he did not hit the victim at any time that day, and he did not point a gun at her or threaten to kill her.

On cross-examination, the Defendant testified that the victim had "been in [his] life for about nine . . . years," and he admitted that he previously stated that he was dating the victim for nine years. He said that he was married when his relationship with the victim occurred. He said that, while he had testified that the victim was fired on August 28, 2002, she still continued to work in the shop until her death in December 2002. The Defendant testified that, during the morning of August 28, 2002, he went to do some errands, and when he returned around 12:00 p.m. the victim was not at the office. He said that when she returned, she had injuries, including "discoloration to her face." He testified that he did not assault the victim on August 28, 2002, and he said that the gun was in the victim's possession the entire time.

Based upon this evidence the jury found the Defendant guilty of reckless aggravated assault and felon in possession of a handgun.

### B. Sentencing Hearing

At the sentencing hearing, the Defendant called Robert Nichols to testify. Nichols stated that he has known the Defendant for over fifteen years, and he works for the Defendant. He described the Defendant as "a nice human being" who tries to help people. He said that the Defendant will give "[a]ny kind of help he can do." He opined that the Defendant "make[s] sure people [are] all right" and is "a pretty good individual as long as [he has] been knowing him." He stated that the Defendant is "a workaholic" and that his customers are "[v]ery happy." Nicols testified that the Defendant is a minister, but he did not know how often the Defendant preached. He stated that he went to church with the Defendant on a few occasions and "mostly every Sunday, [the Defendant] is at church." Nichols said that the Defendant's business is "built around [the Defendant]," and "it's really going to be at a loss without him." He described the Defendant as a good, nice, and helpful person. Nichols testified that, if the Defendant is given prison time, the business will be closed. He stated that he knew the Defendant when the Defendant was charged with armed robbery in 1980 and convicted of assault in 1990, and he said that he did not know of any time that the Defendant carried a gun during the time they spent together.

Ilene Maclin, the Defendant's wife, testified that she and the Defendant have been married for eleven years, and the Defendant is "kind, compassionate . . . God-fearing . . . a hard worker, [and a] good provider." She said that she knew of the Defendant's affair, and she "wasn't happy about it . . . but [she] was glad he came to [her] and told [her] about it." Maclin testified that if the Defendant is sentenced to prison, she would "lose about everything that [she has] . . . [because] he was paying all the bills [except one]." She stated that she and the Defendant do not have any children together, but that there are "five kids among the both of [them]." She said that the Defendant "was a minister, then he was moved higher up as an evangelist of the church." She said that the business is not doing well because the Defendant is not there and this has caused financial problems for her household. Maclin stated that, before these events, the business "was going real

good." She said that the Defendant is "always doing something for somebody." She recommended probation for the Defendant because she is "suffering right now" and "[j]ust today, someone broke into [her] home . . . ."

On cross-examination, Maclin testified that she has known about the affair for about five years and that both she and the Defendant knew the victim because "[they] started helping her." She said that she did not believe that the affair lasted nine years, but that the Defendant "probably said that he knew her for nine years." Maclin testified that the Defendant has been ordained as an evangelist for about four or five years. She said that she was aware that the Defendant had previously been convicted of aggravated robbery with a deadly weapon when he was eighteen years old. She said that she was not aware that the Defendant was convicted of an assault in 1990. She stated that she has never known the Defendant to carry a weapon, and she does not believe that the Defendant is a violent person. She explained that he had never been violent with her.

Valerie Bennett testified that she knew the Defendant because she helped him and his wife around the business, and she met him through the Defendant's mother. She stated that the Defendant is a "nice . . . good . . . hard-working . . . [and] very honest person." She testified that she has known the Defendant for about five years. Bennett testified that the Defendant is "a good person which is deserving enough to have probation." She explained that she has never seen "any kind of meanness or anything toward him." On cross-examination, she said that she knew the victim through work, but was unaware of the affair between the victim and the Defendant. She testified that she was not aware of the Defendant's prior convictions for aggravated robbery with a deadly weapon and assault.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court gave improper jury instructions on the reckless aggravated assault charge; (2) the State failed to fully comply with the Defendant's request for discovery; (3) the trial court erred by denying the Defendant's motion to suppress the weapon found in the Defendant's vehicle; (4) the trial court erred by failing to sever the aggravated assault offense from the felon in possession of a handgun offense; (5) the admission of an unavailable witness' statements violated the Defendant's state and federal rights to confrontation; (6) the trial court erred by finding a witness' statements to be excited utterances; (7) the trial court erred by allowing the jury to learn that the victim was deceased; (8) the State violated a pre-trial order by questioning the Defendant regarding the victim's death; (9) the trial court erred by allowing the State to ask the Defendant if he was married at the time he was involved with the victim; and (10) the trial court erred by not allowing the Defendant to impeach a witness' credibility with a prior conviction involving dishonesty.

## A. Jury Instruction

The Defendant contends that the trial court committed reversible error when it instructed the jury on the offense of reckless aggravated assault. The State concedes that the trial court erred in its instruction to the jury, however, it asserts that this error is harmless beyond a reasonable doubt.

-6-

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. See State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999); State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. Elder, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001); State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001).

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Our supreme court, relying on the words of the United States Supreme Court, has noted that:

> "jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."

Id. (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," Hodges, 944 S.W.2d at 352, only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. State v. Williams, 977 S.W.2d 101, 104 (Tenn. 1998). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997); see also State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997).

In the case under submission, the jury instruction at issue was the instruction on reckless aggravated assault. The trial court gave the following jury instruction for the offense of reckless aggravated assault:

> For you to find the defendant guilty of this offense, the state must have proven, beyond a reasonable doubt, the existence of the following essential elements: That the defendant recklessly caused another to reasonably fear imminent bodily injury and that the defendant used or displayed a deadly weapon.

As provided by statute, a person commits reckless aggravated assault when he or she "recklessly commits an assault as defined in § 39-13-101(a)(1), and: (A) [c]auses serious bodily injury to another; or (B) [u]ses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(2)

(2003). Under Tennessee Code Annotated section 39-13-101(a)(1), a person commits assault when he or she "[i]ntentionally, knowingly or recklessly causes bodily injury to another . . . ." Therefore, the elements of reckless aggravated assault are: (1) intentionally, knowingly, or recklessly causes bodily injury; and (2) causes serious bodily injury to another or uses or displays a deadly weapon.

In State v. Goodwin, 143 S.W.3d 771 (Tenn. 2004), the defendant was convicted of two counts of reckless aggravated assault. The trial court gave jury instructions that were similar to the jury instructions in the case under submission, which the Tennessee Supreme Court determined were erroneous. Id. at 776 n.2. The Court stated that "the plain language defining the offense, reckless aggravated assault requires bodily injury." Id. In State v. Brandon Patrick, No. 03C01-9905-CC-00201, 2000 WL 122247 (Tenn. Crim. App., at Knoxville, Jan. 26, 2000), *no perm. app. filed*, this Court looked at a jury instruction identical to the instruction the jury received in the present case and restated that reckless aggravated assault requires proof that a defendant "(1) Intentionally, knowingly or recklessly causes bodily injury to another." Patrick, 2000 WL 122247, at *5, see also Tenn. Code Ann. § 39-13-101 (a)(1). The Court found that "[t]he trial court's erroneous instruction effectively removed this element from the jury's consideration." The instruction provided to the jury is not an offense recognized by Tennessee law. See Patrick, 2000 WL 122247, at *5.

Similarly, in the case under submission, the jury instruction removed the same language of Tennessee Code Annotated section 39-13-101 (a)(1) from the jury's consideration. We are constrained to conclude that the trial court erred when it instructed the jury. An element of reckless aggravated assault is that a defendant caused bodily injury. Because the jury instructions on reckless aggravated assault did not include "bodily injury" for jury consideration, which is an essential element of reckless aggravated assault, we conclude that the jury received incomplete instructions in this case.

Having found error, we next determine whether the error is harmless. Tennessee Rule of Appellate Procedure 36(b) provides: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." The proper inquiry is "whether it appears beyond a reasonable doubt that the [instructional] error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191. In making the harmless error determination, this court should "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id.

Based upon the facts of this case, in which an essential element of the offense was removed from the jury's consideration, we are unable to conclude that the instructional error was harmless beyond a reasonable doubt. Based on the foregoing reasons, the Defendant is entitled to a new trial for the reckless aggravated assault conviction because of the trial court's instructional error. In the event of further review, however, and because we have concluded that the felon in possession of a handgun conviction and sentence should be affirmed, we will analyze the remaining issues raised on appeal.

**B. Discovery Violation**

The Defendant contends that the State failed to comply with his discovery request. Pretrial, the Defendant filed a motion for discovery, pursuant to Rule 16 of the Tennessee Rules of Criminal Procedure. The Defendant asserts that the State failed to comply with this motion by not giving to him statements that he made to the police during questioning related to a separate incident. The State contends that the Defendant has waived this issue because he failed to object to the use of the statement, on the grounds of failure to disclose, at the time of trial. We agree with the State.

The failure to preserve issues for appeal generally results in a waiver. See Tenn. R. App. P. 36(a); see also State v. Charles Wade Smith, III, No. M2001-01740-CCA-R3-CD, 2003 WL 22116629 (Tenn. Crim. App., at Nashville, September 11, 2003), *no perm. app. filed*. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Further, this Court has held that "[a] trial judge will not be put in error on grounds raised for the first time on appeal when the objection at trial was based on another ground which was declared insufficient." State v. Mitchell Ware, 1986 WL 652, at *2 (Tenn. Crim. App., at Knoxville, Jan 7, 1986), *perm. app. denied* (Tenn. March 24, 1986), see also State v. Calvin Grady Purvis, No. CCA02C01-9412CC0027, 1995 WL 555052, at *5 (Tenn. Crim. App., at Jackson, Sept. 20, 1995), *no perm. app. filed*. Rule 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." After a thorough examination of the record, we conclude that the Defendant has waived this issue because, although the Defendant made a contemporaneous objection, that objection was based on grounds other than discovery. We will, however, discuss this issue on its merits.

Under Tennessee Rule of Criminal Procedure 16, the State has an obligation to disclose any written or recorded statements made by the Defendant and prepared by law enforcement officers. State v. Moore, 703 S.W.2d 183, 185 (Tenn. Crim. App. 1985); see State v. Brown, 552 S.W.2d 383, 386 (Tenn. 1977). The State may withhold disclosure of a statement it does not intend to offer in evidence only if that statement is oral. State v. Hicks, 618 S.W.2d 510, 513 (Tenn. Crim. App. 1981). Otherwise, the defendant has what has been described as "virtually an absolute right" to disclosure. Id. at 513-14 (citation omitted). This Court has held that Rule 16 covers "not only written, recorded and transcribed verbatim statements by a criminal defendant, but also written 'interpretation(s) or summar[ies]' of statements made by the accused, or a memorandum of an interview 'even though not verbatim and not signed' by the defendant." Id. at 514 (citation omitted); see State v. Delk, 692 S.W.2d 431, 436-37 (Tenn. Crim. App. 1985). In Delk, this Court held that a law enforcement agent's notes of an interview with the defendant constituted an "interpretation or summary" of the defendant's statement, and, under Hicks, were subject to full discovery by the defendant upon request. Delk, 692 S.W.2d at 436-37.

To enforce discovery violations under this rule, Tennessee Rule of Criminal Procedure 16(d)(2) provides that if there has been noncompliance, the trial court may order the offending party

to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. "Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." State v. Dennie Ray Loden, No. 03C01-9311-CR-00380, 1995 WL 23351, at *2 (Tenn. Crim. App., at Knoxville, Jan. 19, 1995), *perm. app. denied* (Tenn. 1995) (citing State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984)); see State v. Leon Goins, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999) *perm. app. denied* (Tenn. 2000).

The statement in issue is a statement that the Defendant made to the police in a separate investigation relating to the victim's subsequent death. The Defendant contends that the State had an obligation to disclose any written or recorded statements made by the Defendant to law enforcement. Specifically, the Defendant contends that he was entitled to the disclosure of this statement because it was reduced to writing and was made in response to police interrogation. The State asserts that the statement does not fall within the purview of the discovery rule because the statement was taken in connection with a separate investigation and was used only to impeach the Defendant. Further, the State contends that the statement made by the Defendant to the police does not relate to the offense charged. We agree with the Defendant. The State was under an obligation to disclose, to the Defendant, this statement that the Defendant made to law enforcement officers. The statement falls within Rule 16 because it was a relevant written statement made by Defendant that the State knew of and possessed. See Tenn. R. Crim. P. 16 (a)(1)(A). Further, we note that the section of Rule 16 which requires that the recorded testimony "relates to the offense charged," is applicable only to grand jury testimony.

Having found error, we must next determine whether the error is harmless. Tennessee Rule of Appellate Procedure 36(b) provides: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Further, "evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981) (citing Tenn. R. Crim. P. 16(d)(2)). "The exclusionary rule should not be invoked merely to punish the [S]tate or the defendant for deliberate conduct in failing to comply with a discovery order." Id. We conclude that the Defendant has not shown that he was prejudiced by the State failing to provide to him a copy of this statement before trial. The portion of the statement in issue concerns the status and length of time of the Defendant's relationship with the victim. We find that, considering the weight of the evidence presented at trial, the exclusion of this statement would not have affected the verdict. Therefore, we conclude that the discovery violation by the State was harmless error and, accordingly, this issue is without merit.

### C. Motion to Suppress

Pretrial, the Defendant filed a motion to suppress the weapon found in the Defendant's vehicle. As grounds, the Defendant alleged: (1) the law enforcement officers lacked probable cause to arrest the Defendant; (2) the Defendant was seized without reasonable suspicion; (3) the law enforcement officers entered the Defendant's vehicle without a warrant; and (4) no exigent circumstances existed. The trial court conducted an evidentiary hearing and denied the motion. The trial court held that:

> In the instant case, the gun was particularly described by the victim, and was observed in plain view by the police officers. There was without question reasonable suspicion that the observed gun needed to be preserved as evidence. While taking the time to obtain a warrant, the car might have been driven away by some unknown person with a key, or been broken into to obtain the weapon in plain view through the window. The victim, in her excited state, may have obtained the weapon for some improper use, creating an issue of public safety. Given a deadly weapon in plain view in an unsecured automobile, needed as evidence in a felony arrest, these two police officers had the right to seize the weapon without a warrant, due in no small part to exigent circumstances.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews de novo. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." In general, a warrantless search is considered presumptively unreasonable and, therefore, violates constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Gregory Morrow, No. W2003-02401-CCA-R3-CD, 2004 WL 2050287 (Tenn. Crim. App., at Jackson, Sept. 13, 2004), *no perm. app. filed*. The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants

shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I, section 7 of the Tennessee Constitution provides that:

[P]eople shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Our Supreme Court has held that Article I, section 7 of the Tennessee Constitution "is identical in intent and purpose with the Fourth Amendment," and, therefore, federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). Both of these constitutional provisions are intended to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). In this case, it is clear that the police did not have a warrant to search the Defendant's vehicle.

The plain view exception applies when a seized item is in "plain view" from a lawful vantage point of the officer that conducts the search. See Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); see also State v. Jamie Lee Pittman, No. 03C01-9701-CR-00013, 1998 WL 128801 (Tenn. Crim. App., at Knoxville, March 24, 1998), *no perm. app. filed.* The "plain view" doctrine requires proof that: (1) the objects seized were in plain view; (2) the viewer had a right to be in position for the view; and (3) the incriminating nature of the object was immediately apparent. Horton v. California, 496 U.S. 128, 136-141, (1990); see also State v. Jamie Lee Pittman, No. 03C01-9701-CR-00013, 1998 WL 128801 (Tenn. Crim. App., at Knoxville, March 24, 1998), *no perm. app. filed.*

We conclude that the circumstances surrounding the challenged search satisfy the plain view exception to the warrant requirement. First, the police officers had a right to "be in position for the view" because the Defendant's vehicle was parked at the victim's residence, which was the residence from which the 911 call was received. By merely approaching the vehicle, the police officers were in a legitimate position to look through the window of the vehicle. The vehicle was parked on or around the victim's property and the victim, or someone from the victim's residence, summoned the police. Second, the gun that was seized was in plain view from the officers' position. Officer Gaylor testified that he "observed the pistol on the seat with the blue towel wrapped around it," which matched the description provided by the victim, who had, shortly before, recounted the incident involving the Defendant. Further, Officer Weddle testified that the victim told him that the Defendant pointed the gun at her and the gun was, therefore, used in a crime. Finally, Officer Gaylor

testified that he saw the "barrel [of the gun] sticking out of [the blue towel]," which makes the incriminating nature of the object instantly apparent.

As stated above, the trial court specifically stated that "[i]n the instant case, the gun was particularly described by the victim, and was observed in plain view by the police officers." We find that the police officers were justified in entering the Defendant's vehicle and seizing the weapon based on the plain view exception to the warrant requirement and, therefore, this issue is without merit.

### D. Failure to Sever Offenses

The Defendant next contends that the trial court erred by denying his motion to sever the offenses in this case. Pretrial, the Defendant filed a motion requesting that the trial court sever the felon in possession of a weapon offense from the aggravated assault offense. The trial court denied this motion, holding that:

> There is no question that these two offenses are based on the same conduct, arise from the same episode, are part of a common scheme and are of the same or similar character. Further . . .[e]vidence that the defendant assaulted the victim with the gun would be admissible in his convicted felon in possession of a firearm trial to show possession. It is also not deemed necessary 'to promote a fair determination of the defendant's guilt or innocence of each offense,' that these offenses be severed, Tenn. R. Crim. P. 14(b)(2)(I), especially in light of a curative instruction to be given to the jury along the lines of T.P.I. 42.10 during the introduction of the felony status or conviction, and as well a written instruction at the end of the trial.

A motion for severance of offenses is a matter which addresses itself to the sound discretion of the trial court. State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990). Decisions by trial courts to consolidate or sever offenses are reviewed on an abuse of discretion standard. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the court's ruling. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990). The trial court is required to hold a pretrial hearing to determine the appropriateness of severance. State v. Hoyt, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995). The trial court must make a determination that the evidence of one crime is relevant to a material issue in the trial of the other. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999). The court must then consider whether the probative value of the evidence outweighs any prejudicial effect. Hoyt, 928 S.W.2d at 944.

Rules regarding the consolidation and severance of offenses are included in the Tennessee Rules of Criminal Procedure. Rule 8(b) of the Tennessee Rules of Criminal Procedure, which allows for the permissive joinder of offenses, states: "Two or more offenses may be joined in the same

indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). Rule 13(a) provides as follows: "The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a). Nonetheless, Rule 14 of the Tennessee Rules of Criminal Procedure states that "[i]f two or more offenses have been joined or consolidated for trial . . . , the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). To avoid severance, both portions of the rule must be satisfied. See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993); see also, State v. Tolivar, 117 S.W.3d 216, 227-31 (Tenn. 2003).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999). "Before multiple offenses may be said to reveal a distinctive design, . . . the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" Id. (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986)). The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure is what the Tennessee Supreme Court has deemed the "primary inquiry" in any severance case: whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984). Our Supreme Court has stated that "'[u]nless [it is] expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.'" Moore, 6 S.W.3d at 239 n.5 (quoting Hallock, 875 S.W.2d at 292).

The Court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Id. at 240 n.7. Thus, Tennessee Rule of Evidence 404(b) is relevant to our analysis of this issue. Rule 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. See Tenn. R. Evid. 404(b). Generally, evidence that the accused committed crimes independent of those for which he is on trial is inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. See Moore, 6 S.W.3d at 239; see also Tenn. R. Evid. 404(b). Evidence of other crimes, wrongs, or acts, however, may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" Moore, 6 S.W.3d at 239 n.5 (quoting Hallock, 875 S.W.2d at 292). Offenses that are part of a common scheme or plan are typically offered to establish the identity of the perpetrator. Id. at 239. As the Tennessee Supreme Court has noted, "identity is usually the only relevant issue supporting admission of other offenses when the theory of the common scheme or plan is grounded upon a signature crime." Id.

Finally, the trial court must also conclude that the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission would have on the defendant. Tenn. R. Evid. 404(b)(3); see also State v. Denton, 149 S.W.3d 1, 13 (Tenn. 2004).

The first question, then, for our consideration is whether the offenses in this case were part of a common scheme or plan. The trial court specifically held that "[t]here is no question that these two offenses are based on the same conduct, arise from the same episode, are part of a common scheme and are of the same or similar character." We agree. It is clear that the offenses in this case are part of a common scheme or plan in that the Defendant's possession of a handgun was part of the basis of his indictment, and subsequent conviction, for reckless aggravated assault.

Having determined that the offenses in this case were part of a common scheme or plan, we must now determine whether evidence of one offense would be admissible in the trial of the other if the offenses had been severed. As the trial court stated, "[e]vidence that the [D]efendant assaulted the victim with [a] gun would be admissible" in the Defendant's trial for being a convicted felon in possession of a firearm to show possession. Further, we note that the trial court found that severance of the Defendant's offenses is not necessary "to promote a fair determination of the defendant's guilt or innocence of each offense," especially since the trial court rendered a curative jury instruction during trial and a written jury instruction pertaining to this issue at the end of the trial. See Tenn. R. Crim P. 14(b)(2)(I). The probative value of the Defendant's other offense is not outweighed by its prejudicial effect. We conclude, therefore, that this issue is without merit.

### E. Excited Utterance

The Defendant contends in this appeal that the trial court erroneously allowed Officer Weddle to testify about statements that the victim made to the officer on the day that the assault occurred. Specifically, the Defendant argues that such evidence was inadmissible hearsay. The trial court agreed that these statements were hearsay, but found that they were excited utterances and, as such, were admissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rules or otherwise by law. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). As such, an appellate court will not reverse a trial court's ruling regarding the admission or exclusion of hearsay evidence absent a clear showing that it abused its discretion. Id

The reliability and circumstantial guarantees of trustworthiness of particular nontestimonial statements have allowed courts to make limited exceptions to the hearsay rule. See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-CCA-R3-CD, 2004 WL 305787 (Tenn. Crim. App., at Nashville, Feb. 18, 2004), *perm to app. granted* (Tenn. Oct. 4, 2004). One such exception

is the "excited utterance" exception. An "excited utterance" is defined by Tennessee Rule of Evidence 803(2) as an otherwise inadmissible hearsay statement that "relat[es] to a startling event or condition [and is] made while the declarant was under the stress of excitement caused by the event or condition." In order for this exception to apply, three requirements must be met: (1) there must be a startling event or condition; (2) the statement must "relate to" the startling event or condition; and (3) the declarant must have made the statement while under the stress or excitement of the event or condition. Stout, 46 S.W.3d at 699-700; State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). The rationale for admitting such statements, known as "excited utterances," is twofold:

> First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

Gordon, 952 S.W.2d at 819-20 (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 803(2).1, at 532 (3d ed. 1995)).

The Defendant asserts that the victim's statements are not excited utterances because they were made in response to police questions, and, based on the victim's detailed account of the events, she was not acting spontaneously and free from reflection. Further, the Defendant challenges the spontaneity of the victim's statements and asserts that the victim could not have been "still laboring under the excitement caused by the event or condition" because of the amount of time that passed between the event and the arrival of the police. The State asserts that the victim suffered from a startling event and that this was reflected in her statement to the police. Further, the State contends that the event did not end until the police arrived at the house and made the victim feel safe.

The first requirement for a statement to fall under the excited utterance exception to the hearsay rule is that a startling event occurs. "'[A]ny event deemed startling is sufficient.'" Id. (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 803(2).2, at 53 (3d ed. 1995)). The second requirement, that the statement "relate to" the startling event or condition, can be satisfied in many ways. "'[C]onsiderable leeway is available,' because the statement 'may describe all or part of the event or condition, or deal with the effect or impact of that event or condition.'" Id. (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 803(2).2, at 53 (3d ed. 1995)). Further,

> The time interval is but one consideration in determining whether a statement was made under stress or excitement: Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

State v. Gordon, 952 S.W.2d 817, 820. "[T]he 'event must be sufficiently startling to suspend the normal, reflective thought processes of the declarant.'" Id. (quoting McCormick on Evidence, § 297, at 854 (3d ed. 1984)).

In the case under submission, we conclude that the first two requirements are met. Clearly, there was a startling event involving a gun, and the statements the victim made to the police related to that startling event. The final requirement for the excited utterance exception is that the statement be made while the declarant was still under the stress of the event. It is reasonable to conclude that, in the case under submission, the victim was reacting emotionally to her encounter with the Defendant, which further supports the State's argument that the trial court correctly determined that the victim's statement to Officer Weddle was an "excited utterance." When Officer Weddle arrived at the victim's house, she could see that the victim was "on the couch, crying and shaking." In this case, we conclude that the trial court did not abuse its discretion when it found that the victim's statement was an excited utterance because the victim was laboring under the strain and excitement caused by the main startling event. We conclude, therefore, that this issue is without merit.

### F. Confrontation Clause

The Defendant contends that the admission of the victim's hearsay statements violated the Defendant's State and Federal right to confront witnesses testifying against him. After concluding that the victim's statements are excited utterances, we turn to the substance of the statement to determine its admissibility. See Gomez, 2004 WL 305787; see also State v. Nathan Alex Weaver, No. M2001-00873-CCA-R3-CD, 2003 WL 1877107 (Tenn. Crim. App., at Nashville, Apr. 15, 2003), *no perm. app. filed*.

The Confrontation Clause of the United States Constitution guarantees a criminal defendant the right to confront witnesses against him or her. See U.S. Const. amend. VI; Davis v. Alaska, 415 U.S. 308, 315 (1974). This right is also protected by the Tennessee Constitution. See Tenn. Const., art. I, § 9.[1] The right of confrontation encompasses the right to cross-examine. See Barber v. Page, 390 U.S. 719, 721 (1968). It is the principal means by which the believability of a witness and the truth of his testimony are tested. See Davis, 415 U.S. at 316. The right to confront and cross-examine is not absolute however, and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. See Chambers v. Mississippi, 410 U.S. 284, 295 (1973). Reliable hearsay which comports with an exception to the hearsay rule does not violate a defendant's confrontation rights. State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986); see also State v. Kennedy, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999). Such statements are deemed "so inherently trustworthy that adversarial testing would add little to their reliability." Kennedy, 7 S.W.3d at 66. In Ohio v. Roberts, 448 U.S. 56 (1980), the Supreme Court held that to meet that high burden of truthfulness,

---

[1] Because the Tennessee Constitution requires "face-to-face" confrontation, it affords a defendant greater constitutional protection than does the United States Constitution. See Neil P. Cohen et al., Tennessee Law of Evidence § 802.3 (3d ed. 1995) (citing State v. Deuter, 839 S.W.2d 391 (Tenn. 1992)).

the statement must either: (1) fall within a firmly rooted hearsay exception; or (2) bear particularized guarantees of trustworthiness. Id. at 66.

The Defendant claims that, based on the United States Supreme Court decision in Crawford v. Washington, the victim's statements violate the Defendant's rights to confrontation. In Crawford, the Court determined that statements made by a defendant's wife during a police interrogation, after the defendant allegedly stabbed his wife, violated the defendant's right to confrontation. The Court held that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" Crawford v. Washington, 541 U.S. 36, __ (2004). The Court criticized the Roberts decision because it "conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" Id. at 1369. The Crawford court distinguished between testimonial and non-testimonial evidence.

> Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law- -as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where *testimonial* evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

Id. at 1374 (emphasis added). The Crawford decision did not explicitly define testimonial evidence, however, the Court stated that ". . . it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. In the case under submission, the victim had summoned the police to her home, fearing her safety, and she, subsequently, talked to the police about the events upon their arrival. This was not a formal statement or a police interrogation, and the statements made to the police by the victim were not testimonial in nature. Therefore, according to Crawford, the test set forth in Roberts applies to our determination of whether the victim's testimonial statements were properly admitted.

Reliable hearsay which comports with an exception to the hearsay rule does not violate a defendant's confrontation rights. See State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986) (citing Ohio v. Roberts, 448 U.S. 56, 66 (1980)); see also Kennedy, 7 S.W.3d at 65. Such statements are deemed "so inherently trustworthy that adversarial testing would add little to their reliability." Kennedy, 7 S.W.3d at 66. "Established practice, in short, must confirm that statements falling within a category of hearsay inherently 'carry special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." Lilly v. Virginia, 527 U.S. 116, 128 (1999) (quoting White v. Illinois, 502 U.S. 346, 356 (1992)).

Both the United States Supreme Court and the Tennessee Supreme Court have determined that the excited utterance exception is firmly rooted. State v. Allan Brooks, No. 01C01-9510-CC-00324, 1998 WL 754315, at *11 (Tenn. Crim. App., at Nashville, Oct. 29, 1998), *perm. app. denied* (Tenn. Apr. 19, 1999) (citing White v. Illinois, 502 U.S. 346, 355 n.8 (1992); State v. Taylor, 771

S.W.2d 387, 393-94 (Tenn.1989)). "There can be no doubt that the . . . [excited utterance] exception[] . . . [is] 'firmly rooted.' The exception for spontaneous declarations is at least two centuries old . . . and may date to the late 17th century. . . It is currently recognized in Federal Rule of Evidence 803(2), and in nearly four-fifths of the States." White v. Illinois, 502 U.S. 346, 355 n.8 (1992).

We conclude that the victim's statements are nontestimonial and fall within a firmly rooted hearsay exception. The admittance of these statement, therefore, do not violate the Defendant's right to confrontation. This issue is without merit.

## G. Evidentiary Issues

The Defendant contends that the trial court improperly admitted evidence on three occasions during the trial. First, the Defendant contends that the trial court erred in allowing the jury to learn that the victim was deceased. Second, the Defendant contends that the trial court erred in allowing the State to suggest the date and circumstances of the victim's death. Finally, the Defendant asserts that the trial court erred in allowing the State to ask the Defendant if he was married at the time he was involved with the victim.

In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." See Forbes, 918 S.W.2d at 449. In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000).

After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "Excluding

relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 217 (Tenn. Ct. App. 1999)).

## 1. The Victim was Deceased

The Defendant contends that the trial court erred when it allowed the jury to learn that the victim is deceased. The Defendant asserts that the fact that the victim was deceased was not relevant pursuant to Tennessee Rule of Evidence 401 and, therefore, inadmissible pursuant to Tennessee Rule of Evidence 402. Further, the Defendant asserts that the probative value of the jury learning that the victim was deceased was substantially outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403. The State contends that the unavailability of the victim is relevant and pertains to the credibility of the victim.

Pretrial, the Defendant filed a motion requesting the court to prohibit the State from informing the jury that the victim was now deceased. The trial court denied the motion and held that:

> This Court finds that the State should be allowed to present proof that the victim is now dead, as it has a right to show why she is unavailable as a witness. Otherwise the jury may speculate that she failed to appear out of apathy, or fear of giving false testimony, which would present her statements to the police on the scene in a false light . . . . However, to avoid the possibility of prejudice to the defendant, the State will only be permitted to present this proof by way of stipulation . . . .

We conclude that the trial court did not abuse its discretion by determining that the evidence that the victim was deceased was admissible. The unavailability of the victim is relevant because it affects the credibility of the victim's statements. Further, the information is relevant, as the trial court stated, in order to avoid jury speculation as to why the victim failed to appear. In light of this, the trial court did not abuse its discretion when it determined that the jury should learn that the victim was deceased. Similarly, we conclude that the trial court did not abuse its discretion when it determined that the probative value of allowing the jury to learn that the victim was deceased was not substantially outweighed by its prejudicial effect. As the trial court noted, in order to avoid the possibility of prejudice, the trial court only allowed the State to present a stipulation, and not proof, of the date or circumstances of the victim's death. Therefore, we conclude that this issue is without merit.

## 2. Date and Circumstances of the Victim's Death

The Defendant next alleges that the State violated a pre-trial order that prevented the State from discussing the circumstances of the victim's death. The Defendant asserts that the line of questioning used by the State inferred the date and circumstances of the victim's death. The

Defendant contends that the date and circumstances of the victim's death were not relevant pursuant to Tennessee Rule of Evidence 401 and, therefore, inadmissible pursuant to Tennessee Rule of Evidence 402. Further, the Defendant asserts that the probative value of the date and circumstances of the victim's death were substantially outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403. The State asserts that it did not violate the pre-trial order concerning the victim's death and that the questioning was relevant as impeachment evidence.

During the trial, the Defendant testified, on direct, that, on August 28, 2002, he and the victim were not "so much as friends, but she was an employee at [his] . . . place of business . . . ." On cross-examination, the State asked the following questions:

> Q: And even after this incident happened, you continued to be in a relationship with [the victim], didn't you?
> A: Yes, ma'am.
> Q: Even up until her death in December, you continued to have a relationship with [the victim]?
> A: Yes ma'am.
> . . .
> Q: And if we could begin on this line: "Did you see [the victim] on Monday, December 30th, 2002?" Do you remember your answer?
> A: Yes, I do.
> Q: What was your answer?
> A: "Yes, around 12:50 P.M. at her home."
> Q: "Was she there alone?" Do you remember your answer?
> A: "As far as I know, yes."

The Defendant objected to this line of questioning because he contended that it may cause the jury to think that the Defendant was involved with the victim's death. The trial court determined that the questioning was valid and did not violate the pre-trial order. After thoroughly reviewing the record, we agree with the trial court that the questioning was relevant and, pursuant to Tennessee Rules of Evidence 401 and 402, the trial court did not abuse its discretion when it determined that the evidence was admissible. The question was not an inquiry into or about the victim's death but, rather, it was about the duration of the relationship between the Defendant and the victim. Accordingly, we conclude that this issue is without merit.

### 3. Defendant's Marital Status

The Defendant contends that the trial court erred when it allowed the jury to learn that he was married at the time of his relationship with the victim. He asserts that this evidence was not relevant pursuant to Tennessee Rule of Evidence 401 and, therefore, inadmissible pursuant to Tennessee Rule of Evidence 402. Further, the Defendant asserts that the probative value of his marital status was substantially outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403. The Defendant contends that, since he never testified that he was not married, there was no

-21-

reason to admit this evidence. The State asserts that the Defendant's marital status is relevant to the Defendant's credibility concerning his relationship with the victim.

The scope of cross-examination is limited to matters which are material to issues raised by the parties, the credibility of a witness, and the guilt or innocence of the accused. State v. Aucoin, 756 S.W.2d 705, 710-11 (Tenn. Crim. App. 1988) (citations omitted). As a general rule, facts and circumstances concerning a witness' prior marriages and affairs are not admissible in a criminal prosecution unless it can be shown that the matters are relevant to an issue, the credibility of a witness, or the guilt or innocence of the accused. Id. at 711; see also Gray v. State, 191 Tenn. 526, 531, 235 S.W.2d 20, 22-23 (1950).

During the trial, and before the defendant testified, the trial court decided that the Defendant's marital status was relevant and held as follows:

> But regard to his marital status, I think it is relevant. There was testimony from the state's witnesses that she indicated that they were in a relationship. Statements were made, in opening statements by [Defendant's attorney], that he was merely her employer, and that was the extent of their relationship, and she was mad because she was getting fired from the job. So, his personal status is relevant based on all of the circumstances that have already been brought out in front of the jury, and so I will allow [the State] to inquire as to that . . . . I think the probative value would substantially outweigh any prejudice involved. The probative value being this man's credibility as a witness in this case.

We conclude that the trial court did not abuse its discretion when it found that evidence of the defendant's marital status was relevant to the credibility of the Defendant. The Defendant testified that, at the time of the incident, his relationship with the victim was such that he "wouldn't say so much as friends, but she was an employee at my place . . . ." The Defendant asserted that the victim blamed this assault on him because he fired her. The Defendant's marital status is relevant as it pertains to his credibility regarding his relationship with the victim and the circumstances surrounding the incident. There was evidence that the victim and the Defendant were having an affair. The fact that the Defendant was married at the time is relevant to his credibility because he made conflicting statements about the existence and status of his relationship with the victim. Accordingly, we conclude that this issue is without merit.

### H. Prior Conviction

The Defendant contends that the trial court erred by refusing to allow him to impeach the victim with the victim's 1983 conviction for "forging, uttering and publishing forged U.S. Treasury Check in violation of Title 18 U.S.C., § 495." The State claims that the trial court properly excluded evidence of the conviction because it was more than ten years old. We agree with the State.

-22-

Before trial, the Defendant asked the trial court to allow the victim's prior conviction for forgery be introduced into evidence. The Defendant claimed that, since the victim was unavailable to testify and her statements to police would be introduced, this would be the only way to impeach the victim's credibility. The trial court did not allow the prior conviction to be introduced, holding that:

> Well, I think that it's so far exceeds the ten-year limitation that it's probative value is minimal at best. I think that - I've allowed offenses that do exceed the ten-year limitation to be asked when it just, perhaps barely exceeds ten years - ten years that amounts to eleven years or if there's a continuing pattern every other year for every other six months someone is getting a new conviction, and it goes all the way from now back through fifteen years, then I'll allow that pattern to be demonstrated on past the ten years. But if this is a situation where there is one lone conviction from 1982, and it's now 2003, I don't think that is appropriate to use.

Although specific instances of conduct may be used to impeach a witness if the conduct is probative of the witness's character for truthfulness or untruthfulness, the trial court must "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." See Tenn. R. Evid. 608 (b). Further, Tennessee Rule of Evidence 609 provides:

> (b) Time Limit. – Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution . . . . Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interest of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs the prejudicial effect.

Tenn. R. Evid. 609(b). A trial court's ruling under Rule 609 will not be reversed absent an abuse of discretion. See Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979).

We conclude that the trial court did not abuse its discretion when it found that the introduction of this proof would have little probative value, if any, and did not substantially outweigh the prejudicial effect. The victim's conviction was about twenty years old and there was no pattern of dishonesty or criminal activity in her record. Accordingly, this issue is without merit.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment, in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

_____

ROBERT W. WEDEMEYER, JUDGE